Slip Op. 15-29

**UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| COALITION OF GULF SHRIMP INDUSTRIES, | |
| Plaintiff, | |
| v. | |
| UNITED STATES, | |
| Defendant, | |
| and | |
| VIETNAM ASSOCIATION OF SEAFOOD EXPORTERS AND PRODUCERS, ZHANJIANG GUOLIAN AQUATIC PRODUCTS, CO., LTD., SEAFOOD EXPORTERS ASSOCIATION OF INDIA, NATIONAL CHAMBER OF AQUACULTURE (ECUADOR), EASTERN FISH COMPANY, INC., MAZZETTA COMPANY LLC, ORE-CAL CORPORATION, SEAFOOD EXCHANGE OF FLORIDA, SEA PORT PRODUCTS CORPORATION, STAVIS SEAFOODS, INC., TRI UNION PROZEN PRODUCTS D/B/A CHICKEN OF THE SEA FROZEN FOODS, AQUATECH VENTURE SDN BHD, HK FOOD (M) SDN BHD, KIAN HUAT FISHERY SDN BHD, OCEAN FAMOUS SDN BHD, OCEAN PIONEER FOOD SDN BHD, SANJUNE SDN BHD, SUNLIGHT SEAFOOD SDN BHD, AND TM FOODS SDN BHD, | Before: Gregory W. Carman, Senior Judge<br><br>Court No. 13-00386 |
| Defendant-Intervenors. | |

## OPINION AND ORDER

[Denying Plaintiff's Motion for Judgment on the Agency Record and sustaining the International Trade Commission's negative final injury determination.]

Dated:April 3, 2015

*Terence P. Stewart, Elizabeth J. Drake*, *Philip A. Butler, Stephanie M. Bell,* and *Jennifer M. Smith,* Stewart and Stewart, of Washington, DC, and *Edward T. Hayes*, Leake & Andersson, LLP, of New Orleans, LA, for plaintiff.

*Robin L. Turner*, Attorney, Office of the General Counsel, U.S. International Trade Commission, of Washington, DC, for defendant. With her on the brief were *Dominic L. Bianchi*, General Counsel, and *Neal J. Reynolds*, Assistant General Counsel for Litigation.

*Warren E. Connelly* and *Jarrod M. Goldfeder*, Akin, Gump, Strauss, Hauer & Feld, LLP, of Washington, DC, for defendant-intervenors National Chamber of Aquaculture (Ecuador), Eastern Fish Company, Inc., Mazzetta Company LLC, Ore-Cal Corporation, Seafood Exchange of Florida, Sea Port Products Corporation, Stavis Seafoods, Inc., and Tri Union Frozen Products d/b/a Chicken of the Sea Frozen Foods.

*Matthew R. Nicely*, *Robert L. LaFrankie, II*, and *Alexandra B. Hess*, Hughes Hubbard & Reed LLP, of Washington, DC, for defendant-intervenor Vietnam Association of Seafood Exporters and Producers.

*Mark P. Lunn* and *Daniel Morris*, Dentons US LLP, of Washington, DC, for defendant-intervenor Seafood Exporters Association of India.

*Robert G. Gosselink* and *Jonathan M. Freed*, Trade Pacific, PLLC, of Washington, DC, for defendant-intervenor Zhanjiang Guolian Aquatic Products Co., Ltd.

*Kelly A. Slater*, *Edmund W. Sim*, and *Jay Y. Nee*, Appleton Luff Pte Ltd., of Washington, DC, for defendant-intervenors Aquatech Venture Sdn Bhd, HK Food (M) Sdn Bhd, Kian Huat Fishery Sdn Bhd, Ocean Famous Sdn Bhd, Ocean Pioneer Food Sdn Bhd, Sanjune Sdn Bhd, Sunlight Seafood Sdn Bhd, and TM Foods Sdn Bhd.

Carman, Senior Judge:  Before the Court is Plaintiff Coalition of Gulf Shrimp Industries'

("Plaintiff" or "COGSI" or "Petitioner") Motion for Judgment on the Agency Record ("Pl.'s

Mot."), pursuant to USCIT Rule 56.2, challenging the U.S. International Trade Commission's

("Defendant" or "ITC" or "Commission") negative final determination in the countervailing duty

("CVD") investigation concerning frozen warmwater shrimp from various countries published as

*Frozen Warmwater Shrimp from China, Ecuador, India, Malaysia, and Vietnam*, 78 Fed. Reg.

64,009 (ITC Oct. 25, 2013) (final determination) ("*Final Determination*"), P.R.[1] 393, and the

accompanying views of the Commission, USITC Pub. 4429, Inv. Nos. 701-TA-491-493, 495 and

497 (final) (Oct. 2012) ("Views"), P.R. 382, C.R. 1282.[2]  For the reasons stated below, the Court

denies Plaintiff's motion and sustains the ITC's negative final injury determination.


BACKGROUND

On December 28, 2012, COGSI filed CVD petitions with the ITC and the U.S.

Department of Commerce ("Commerce"), alleging that exports of frozen warmwater shrimp[3]

---

[1] P.R. stands for public administrative record and C.R. for confidential administrative record. Plaintiff and Defendant-Intervenors use these citations.  Defendant denotes the public documents with the number "1" and confidential documents with the number "2."  *See* Def. Int'l Trade Comm'n's Opp'n to Pls.' [*sic*] Mot. for J. on the Agency Record ("Def.'s Opp'n") at 1, n.2.  For ease of reference, the Court will only refer to P.R. and C.R. in this opinion.

[2] This confidential version of the Views consolidates the ITC's majority views and confidential report.  *See* Def.'s Opp'n at 1, n.2.

[3] The product description, which is not contested, is, in pertinent part:

> [c]ertain frozen warmwater shrimp and prawns, whether wild-caught
> (ocean harvested) or farm-raised (produced by aquaculture), head-on or
> head-off, shell-on or peeled, tail-on or tail-off, deveined or not deveined,
> cooked or raw, or otherwise processed in frozen form, regardless of size.

Views at 7.  This abbreviated description is provided merely for convenience's sake because the scope is "virtually identical to that in the prior investigations and reviews regarding frozen warmwater shrimp" and familiarity is presumed.  *Id.*

from China, Ecuador, India, Indonesia, Malaysia, Thailand and Vietnam were receiving

countervailable subsidies, and that the domestic industry was suffering material injury, and

threatened with material injury, by reason of these subsidized imports. *See* Pl.'s Mot. at 2 (citing

P.R. 382 at I-1). The ITC initiated investigations with a period of investigation ("POI") starting

in 2009 and ending after the third quarter of 2012. *See id.* at 3. On February 15, 2013, the ITC

issued an affirmative preliminary injury determination. *See Frozen Warmwater Shrimp from*

*China, Ecuador, India, Malaysia, and Vietnam*, 78 Fed. Reg. 11,221 (ITC Feb. 15, 2013)

(preliminary determination), P.R. 110.[4] During the final phase of the investigations, despite

Plaintiff's plea, the ITC decided to start the POI in 2010 rather than 2009. *See* Pl.'s Mot. at 3.

COGSI argues that the POI should start in 2009 because the April 10, 2010 Deepwater Horizon

oil spill in the Gulf of Mexico by British Petroleum ("BP Oil Spill") "seriously disrupted

domestic production in 2010." *Id.* (citing P.R. 141 at 2-6).

On September 20, 2013, the ITC found by a 4-2 vote that the domestic industry was

neither materially injured nor threatened with material injury by reason of subsidized imports

from the five subject countries. *See id.* (citing P.R. 382 at 3, n.1, I-1). On November 22, 2013,

COGSI appealed the ITC's *Final Determination* in this court. *See Summons*, ECF No. 1.

---

[4] With the ITC's preliminary finding of injury, Commerce published affirmative subsidies for
China, Ecuador, India, Malaysia and Vietnam, with all-others' margins ranging from 4.52% to
54.4%. *See* Pl.'s Mot. at 3 (citing P.R. 382 at I-5-I-6). Challenges to those margins have also
been filed with the court, but those actions are stayed pending the outcome of this one.

### JURISDICTION & STANDARD OF REVIEW

The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1581(c) (2012).[5]  The court will uphold an agency determination that is supported by substantial evidence and otherwise in accordance with law.  19 U.S.C. § 156a(b)(1)(B)(i).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (internal quotation and citation omitted).  Substantial evidence review requires consideration of "the record as a whole, including any evidence that fairly detracts from the substantiality of the evidence," *Gallant Ocean (Thailand) Co., Ltd. v. United States*, 602 F.3d 1319, 1323 (Fed. Cir. 2010) (internal quotation and citation omitted), and asks, in light of that evidence, "is the determination unreasonable," *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1351 (Fed. Cir. 2006) (internal quotation and citation omitted).

The possibility of "drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  *Am. Textile Mfrs. Inst., Inc. v. Donovan*, 452 U.S. 490, 523 (1981).  Under the substantial evidence standard, the court will not "displace the [agency's] choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*."  *Universal Camera*, 340 U.S. at 488.  The court "may not reweigh the evidence or substitute its own judgment for that of the agency."  *Usinor v. United States*, 28 CIT 1107, 1111, 342 F. Supp. 2d 1267, 1272 (2004).

---

[5] All references to the United States Code refer to the 2012 edition, unless otherwise stated.

**DISCUSSION**

COGSI challenges the ITC's negative final injury determination.  Under 19 U.S.C.

§1671d(b), the ITC issues an affirmative determination only if it finds "present material injury or

a threat thereof" and makes a "finding of causation."  *Hynix Semiconductor, Inc. v. United*

*States*, 30 CIT 1208, 1210, 431 F. Supp. 2d 1302, 1306 (2006) (internal quotation and citation

omitted).  In making a material injury determination, the ITC considers "the volume of imports

of the subject merchandise, "the effect of imports of that merchandise on prices in the United

States for domestic like products," and "the impact of imports of such merchandise on domestic

producers of domestic like products . . . in the context of production operations within the United

States."  19 U.S.C. § 1677(7)(B)(i)(I)-(III).  The ITC "shall explain its analysis of each factor

considered."  19 U.S.C. §1677(7)(B).  The Commission may also "consider such other economic

factors as are relevant to the determination" but must identify each of these other factors and

"explain in full its relevance to the determination."  *Id*.

## I.      Volume

When evaluating the volume of imports of subject merchandise, the ITC "shall consider

whether the volume of imports of the merchandise, or any increase in that volume, either in

absolute terms or relative to production or consumption in the United States, is significant."  19

U.S.C. § 1677(7)(C)(i).

### A.      Contentions

COGSI contends that the ITC's volume determination was unsupported by substantial

evidence and contrary to law.  *See* Pl.'s Mot. at 17-21, Pl.'s Reply Br. ("Pl.'s Reply") at 6-10.

COGSI agrees that the Commission "correctly determined subject imports were significant in

absolute terms, relative to consumption, and relative to domestic production, and that the

volumes increased over the POI" but contests the Commission's conclusion that "the rate of

subject imports' increase was not significant because the domestic industry also experienced

gains in shipments and market share in the two years after the [BP] Oil Spill."  Pl.'s Mot. at 18.

COGSI asserts that "[t]his singular focus on the rate of increase is inconsistent with the statutory

structure, which directs the Commission to determine whether <u>either</u> the volume of subject

imports, <u>or</u> any increase in that volume, is significant, either in absolute terms or relative to

domestic production or consumption."  *Id*. (emphasis in original).  COGSI propounds that

"subject imports gained shipments and market share" more rapidly than domestic producers, who

were "struggling to recover from the [BP] Oil Spill."  *Id*. at 20.

      In a footnote in its motion, COGSI also asserts that the Commission "failed to fully

address the fact that the increases experienced by both subject imports and domestic producers

coincided with a 'substantial decline in nonsubject imports' due a disease outbreak [Early

Mortality Syndrome ("EMS")[6]] in those countries."  *Id*., n.5 (citing P.R. 382 at 27, n.141).

Accordingly, COGSI asserts that the ITC's negative volume determination is unsupported by

substantial evidence.

      The ITC counters that its volume determination was supported by substantial evidence

and in accordance with law.  *See* Def.'s Opp'n at 6-7, 16-20; *see also* Joint Resp. Br. of Def.-

---

[6] At the time of the ITC's investigation, the outbreak of EMS was "affecting farm-raised shrimp in three subject countries (China, Malaysia and Vietnam) and nonsubject country Thailand." Views at 31.  The specific cause of EMS was identified in the spring of 2013 but no reliable test had been created to identify the affected shrimp at the time the *Final Determination* issued.  *See id*.

Intervenors in Opp'n to Pl.'s Mot. for J. on the Agency R. ("Def.-Ints.' Opp'n") at 6-15.[7]  In its

*Final Determination*, the ITC found that "the volume of subject imports was significant both in

absolute terms and relative to consumption and production in the United States."  Def.'s Opp'n

at 7.  However, the Commission concluded that the "increases in that volume and market share

were not significant" because the domestic industry's market share also increased during the

POI.  *Id*.  The Commission also reasoned that "any increases in subject imports' volumes and

market share came at the expense of nonsubject imports, not at the expense of the domestic

industry."  *Id*. at 6 (citing Views at 37-38).  The ITC noted that "the increases in subject imports

did not prevent the domestic industry from also experiencing gains in shipments and market

share in a declining U.S. market during the POI."  *Id*. at 16-17.

Regarding COGSI's allegation that it relied solely on the rate of increase in its volume

analysis, the Commission counters that it "clearly considered all of the statutory factors relating

to subject import volume."  Def.'s Opp'n at 17.  Upon consideration of the absolute volume and

market share and the increases in the volume and market share of subject imports, the ITC found

that "the absolute volumes and market share of subject imports" were significant but that "the

increases in the volumes and market share of subject imports" were not significant because "they

were not made at the expense of the domestic industry[,] whose shipment and market share also

increased."  *Id*. at 17-18 (citing Views at 37-38).  The ITC found that both subject imports and

shipments by the domestic industry increased during the POI at the expense of the nonsubject

---

[7] The Court notes that Defendant-Intervenors make essentially the same arguments as Defendant throughout their brief and thus references to the ITC's contentions throughout the opinion also represent Defendant-Intervenor's contentions.

imports, particularly from Thailand, which had a "devastating outbreak of EMS." *Id*. at 20

(quoting Views at 38, n.141). The Commission concluded that "it was precisely because [ ]

subject imports did not fully offset this substantial decline in nonsubject imports that the

[domestic] industry was able to increase its shipments and market share during the POI, which

suggests that the industry was not significantly affected by the increases in subject imports." *Id*.

The ITC avers that both the statute and case law make abundantly clear that it has

"discretion to weigh the importance of the various factors identified in the statute and to

determine whether these factors indicate, as a whole, that subject imports are having a significant

adverse effect on the industry's volume, market share and condition." *Id*. at 18-19. The ITC

asserts that "the Court should [ ] reject COGSI's invitation to reweigh the evidence and should

affirm this aspect of the Commission's analysis." *Id*. at 20.

## B.      Analysis

The relevant statute directs the ITC to consider "whether the volume of imports of the

merchandise, or any increase in that volume, either in absolute terms or relative to production or

consumption in the United States, is significant." 19 U.S.C. § 1677(7)(C)(i). A review of the

record and the ITC's *Final Determination* and Views demonstrate that the ITC considered the

statutory requirements of volume in both absolute and relative-to-production terms, and the

increases thereof.

The Court finds the Commission not only complied with statutory requirements but also

took into consideration atypical events that affected production during the POI, such as the BP

Oil Spill and EMS. *See* Views at 30-32. Upon weighing these factors, the ITC determined that

the increase in volume of subject imports was not significant because COGSI's domestic

shipments also increased, and both increases occurred at the cost of nonsubject imports.  *See*

Views 37-38.  The Court finds that the Commission's conclusion is reasonable and grounded in

evidence on the record.  The mere fact that COGSI did not agree with this conclusion does not

make it unreasonable.  The ITC is afforded much discretion on how it weighs the relevant

factors, and the Court "may not reweigh the evidence or substitute its own judgment for that of

the agency."  *Usinor,* 342 F. Supp. 2d at 1272 (citation omitted).  Thus, the Court will not disturb

the ITC's conclusion that the increases in the volumes and market share of subject imports were

not significant because the Court finds that the volume conclusion was not unreasonable.

For the foregoing reasons, the Court affirms the volume aspect of the *Final*

*Determination*.

## II.     Price Effects

When evaluating the effect of imports of subject merchandise, the ITC must consider

whether: (1) "there has been significant price underselling by the imported merchandise as

compared with the price of domestic like products of the United States" and (2) "the effect of

imports of such merchandise otherwise depresses prices to a significant degree or prevents price

increases, which otherwise would have occurred, to a significant degree."  19 U.S.C.

§1677(7)(C)(ii)(I)-(II).

### A.     Underselling

The underselling component of the ITC investigation considers whether the subject

merchandise has significantly undersold domestic like products in the United States.  *See* 19

U.S.C. § 1677(7)(C)(ii)(I).

## 1.    Contentions

COGSI contends that the ITC's underselling determination was inconsistent with prior

determinations and unsupported by substantial evidence.  *See* Pl.'s Mot. at 21-23, Pl.'s Reply at

10-13.  COGSI claims that the data "showed subject imports underselling domestic product in

166 of 258 comparison since 2010, or 64% of the time," and also "showed the frequency and

intensity of underselling increasing over the POI as the volume of imports rose," citing an

underselling rate jump from 40.7% at the beginning of the POI in 2010 to 84.2% by the end of

the POI in interim 2013.  *Id*. at 21 (citing P.R. 305 at 7, Ex. 3).  COGSI further claims that the

ITC's refusal to use the National Marine Fisheries Service ("NMFS") pricing data "is an

unexplained departure from a prior determination."  *Id*. at 22 (referencing a 2005 changed

circumstances review of shrimp from Thailand and India).  COGSI asserts that the ITC "did not

address the price-sensitivity of the domestic shrimp market and the fact that both purchasers and

processors reported imports were priced lower than domestic product."  *Id*. at 26.

The ITC counters that its conclusion that price underselling was mixed but not significant

was reasonable.  *See* Def.'s Opp'n at 22-28; *see also* Def.-Ints.' Opp'n at 18-26.  First, the

Commission "conducted a thorough analysis of the record evidence pertaining to substitutability

and the importance of price" in the frozen shrimp market and "concluded that price was at least a

moderately important factor."  Def.'s Opp'n at 22-23 (citing Views at 20-21, 32-36 and 39,

n.144).  The Commission then "collected a comprehensive pricing data base" from the

questionnaire responses and upon analysis found that the "record showed a pattern of mixed

underselling and overselling and not significant price underselling by subject imports."  Def.'s

Opp'n at 23 (citing Views at 40 and C.R. 1284 at V-11).  The ITC declined to use the alternative

data series proffered by Plaintiff, which included the prices of frozen seafood in New York

reported by NMFS and data from the Urner Barry market news service.  *Id*. at 23-24.  The

Commission found the questionnaire responses more specific, comparable and reliable, and

explained that in "every prior investigation and review involving frozen shrimp in which the

Commission collected pricing data in its questionnaires, the Commission has relied on pricing

data compiled from questionnaire responses rather than alternative pricing series" and thus its

"decision to rely on its own questionnaire data . . . was entirely reasonable."  *Id*. at 24-25.

Regarding the inclusion of Product 1 data, the ITC highlights that Product 1 was

"specifically included" in "its questionnaires in the preliminary investigations at the request of

Plaintiff."  *Id*. at 26 (citing Views at 40, n. 149).  The ITC notes that "[s]ince Plaintiff itself asked

the Commission to obtain pricing data for Product 1, [it] reasonably chose not to exclude Product

1 from its underselling analysis or minimize the weight that it gave to pricing comparisons

including that product."  *Id*. at 27.  Further, the ITC claims that Plaintiff thus "failed to seek a

change in the definition of pricing Product 1 when requested in the final investigation" during

the comment period.  *Id*. at 26.  Accordingly, the ITC asserts that Plaintiff "failed to exhaust its

administrative remedies on this issue before the Commission in a timely manner" and claims the

"Court should not allow it to raise this issue now."  *Id*. at 27.

## 2.      Analysis

When evaluating challenges to the ITC's methodology, the court will affirm the chosen

methodology as long as it is reasonable.  *See U.S. Steel Group v. United States*, 96 F.3d 1352,

1361-62 (Fed. Cir. 1996).  COGSI challenges certain decisions regarding the ITC's

methodology, such as data selection, and the Court reviews these decisions for reasonableness.

The ITC has discretion to select a data set that it will use in its investigation, and in the instant case, the ITC explained that it "collected a comprehensive pricing data base" from the questionnaire responses and decided to use that data set.  Def.'s Opp'n at 23 (citing V-11).  The Commission stated that when it "has reliable, comprehensive pricing data obtained from its questionnaire responses, as it did in the underlying investigations," it has "consistently relied on that data, rather than rely on alternative public source data series."  Def.'s Opp'n at 25.  The ITC provides case law supporting its position that it is within its discretion "to select a particular methodology to assess significance of evidence of price undercutting."  *Id*. at 25 (quoting *Acciai Speciali Terni, S.p.A. v. United States*, 19 CIT 1051, 1067 (1995).  The fact that the ITC declined to use alternative pricing data does not negate the reasonableness of the pricing data that it selected.

The Court finds that COGSI's allegation that the ITC's refusal to use the NMFS data is a departure from a prior determination is inapposite.  That prior determination relied upon by COGSI is a changed circumstance review, not an investigation, and the ITC need not justify using different data for an entirely different type of review.[8]  The Court agrees with the ITC that its chosen methodology—relying on its questionnaire responses—was reasonable.

The Court also finds that the Commission's decision to include Product 1 in its pricing analysis is reasonable.  The Commission specifically included Product 1 in its questionnaires in

---

[8] However, the ITC did provide an explanation: it used "alternative pricing data," not data from questionnaire responses, in the changed circumstance review of 2005 because the reviews were "conducted immediately after the tsunami that devastated India and Thailand" and it "decided not to collect pricing data in the questionnaires to reduce the burden on questionnaire recipients" because the Commission had just collected data for the preliminary and final investigations in the immediate prior 18 months.  Def.'s Opp'n at 24-25, n.20.

the preliminary investigations at COGSI's behest, and COGSI declined to seek a change in the

definition of pricing Product 1 when requested in the final investigations.  *See* Views at 40,

n.149.  Consequently, the ITC's decision to include Product 1 is reasonable.  Further, the ITC

explained that it treated this product similarly in 2005, choosing "neither [to] give controlling

weight to the data for product 1 nor to disregard it."  Def.'s Opp'n at 27 (internal quotation and

citation omitted).  Plaintiff's allegation that the Commission's "failure to address the probative

value of Product 1 pricing data" when it "failed to place less weight" on it "rendered [the]

negative price effects determination unsupported by substantial evidence" cannot prevail because

the ITC's inclusion of Product 1 is supported by evidence on the record and the Court cannot

assign probative value or reweigh the evidence.  Pl.'s Mot. at 25.  Similar to the volume aspect,

the Court will not disturb the ITC's conclusion that the price underselling of subject imports was

not significant because the Court finds that the price underselling conclusion was not

unreasonable.  Since Plaintiff's contention does not prevail on the merits, the Court need not

address Defendant's exhaustion defense.

For the foregoing reasons, the Court affirms the underselling aspect of the *Final
Determination*.

### B.    Price Suppression

When evaluating the effect of imports of subject merchandise, the ITC must consider

whether "the effect of imports of such merchandise otherwise depresses prices to a significant

degree or prevents price increases, which otherwise would have occurred, to a significant

degree."  19 U.S.C. § 1677(7)(C)(ii)((II).

### 1.        Contentions

COGSI contends that the ITC's price suppression determination is unsupported by

substantial evidence and otherwise contrary to law.  *See* Pl.'s Mot. at 29-36, Pl.'s Reply at 13-17.

COGSI asserts that the ITC's exclusion of "2012 data for one processor" and reliance on a

negative underselling finding to support a negative price suppression finding" are contrary to

law.  Pl.'s Mot. at 29, 31.  Plaintiff also argues that the ITC's "negative price suppression

determination was [ ] unsupported by substantial evidence."  *Id*. at 32.  COGSI asserts that by

excluding one processor's 2012 data, the ITC violated the statutory mandate to define industry as

"the producers as a whole of the domestic like product."  *Id*. at 20 (quoting 19 U.S.C.

§§1671d(b)(1), 1677(4)(A)).  In addition, Plaintiff purports that the ITC's decision to exclude

2012 data for one processor "minimized the full extent of price suppression being suffered by the

domestic industry" and alleges that the processor "did not meet any of the criteria for exclusion

under 19 U.S.C. § 1677(4)(B)."  Pl.'s Mot. at 29 & n.8.

The ITC counters that its price suppression determination was supported by substantial

evidence and in accordance with law.  *See* Def.'s Opp'n at 28-33; *see also* Def.-Ints.' Opp'n at

27-32.  The ITC "found that subject imports did not significantly suppress domestic prices

during the POI."  Def.'s Opp'n at 28.  The Commission acknowledged that the domestic

industry's COGS/net sales ratio slightly increased over the POI but determined that this increase

"was significantly affected by the substantial increases in one producer's COGS/net sales that

were associated with a factory relocation and machinery/equipment upgrade [ ] in 2012."  *Id*.

The ITC contends that it used this producer's "own testimony that its factory relocation was the

reason for its huge losses and its high costs relative to net sales in 2012," and thus its conclusion

that "the bulk of the increase in the industry's COGS to net sales ratio in 2012 was due to the costs associated with" this producer's relocation and upgrade is reasonable.  *Id*. at 29.

Further, the Commission explains that "the domestic producers reported their cost components in an inconsistent manner in their questionnaire responses," and accordingly the Commission "chose to focus on the industry's overall COGS data rather than on individual elements of that category, which varied between producers."  *Id*. at 30, 31.  The ITC posits, contrary to COGSI's contention, that it "did not improperly require[ ] that the subject imports undersell the domestic shrimp significantly as a required element of its price suppression finding" because the Commission based its price suppression conclusion on the evidence that the domestic industry's "COG/net sales ratio increased only 'slightly' and were significantly affected by the one-time factory relocation cost increase for" one processor.  *Id*. (citing Views at 41).

### 2.    Analysis

When evaluating challenges to the ITC's methodology, the court will affirm the chosen methodology as long as it is reasonable.  *See U.S. Steel Group*, 96 F. 3d at 1361-62.  The Court examines "not what methodology [Plaintiff] would prefer, but . . . whether the methodology actually used by the Commission was reasonable."  *JMC Steel Group v. United States*, 38 CIT __, __, 24 F. Supp. 3d 1290, 1300 (2014) (internal quotation and citation omitted).  COGSI challenges certain decisions regarding methodology, such as data selection, and the Court reviews these decisions for reasonableness.

The Court finds that the ITC's decision to exclude a processor that had a one-time relocation expense which skewed the data is supported by record evidence.  The ITC delineated

that the domestic industry's slight increase in COGS/net sales was "significantly affected by the

substantial increases in one producer's COGS/net sales that were associated with" a one-off

event of "a factory relocation and machinery/equipment upgrade" in 2012. Def.'s Opp'n at 28-

29 (internal quotation omitted). This processor's one-off relocation and upgrade was "not related

to subject imports." *Id*. at 29 (citing C.R. 1112, Response at 1). The Court finds reasonable the

ITC's decision to exclude this processor. Further, because individual data was inconsistent, the

ITC's decision to focus on the industry's overall COGS data was also reasonable. *See id*. at 31.

Upon a review of the relevant statute regarding price suppression, the Court agrees with

the ITC that the statute requires that the Commission determine whether subject imports "prevent

price increases, which otherwise would have occurred, to a significant degree." 19 U.S.C. §

1677(7)(C)(ii)(II). Defendant argues that Plaintiff's price suppression challenge hinges on the

statutory language "to a significant degree," and the Commission determined that "the record

showed that any price suppression was minimal during the POI," not rising to the level of

significant. Def.'s Opp'n at 32. The Court finds that the ITC's price suppression conclusion was

supported by record and within its statutory discretion.

For the foregoing reasons, the Court sustains the price suppression aspect of the *Final*

*Determination*.

### III.    Impact on affected domestic industry

When examining the impact of imports of subject merchandise on domestic producers of

domestic like products in the context of production operations, the ITC must consider, in relevant

part, (1) "actual and potential decline in output, sales, market share, profits, productivity, return

on investment, and utilization of capacity"; (2) "factors affecting domestic prices"; (3) "actual

and potential negative effects on cash flow, inventories, employment, wages, growth, ability to

raise capital, and investment"; and (4) "actual and potential negative effects on the existing

development and production efforts of the domestic industry."  19 U.S.C. § 1677(7)(C)(iii)(I)-

(IV).

### A.      Contentions

COGSI contends that the ITC's impact determination is inconsistent with prior practice

and unsupported by substantial evidence.  *See* Pl.'s Mot. at 36-41, Pl's Reply at 17-21.  COGSI

alleges "as subject imports rose from 2010 to 2012, fishermen's number of workers, hours

worked, days at sea, and operating income all declined, and their already high ratio of operating

expenses to net sales increased."  Pl.'s Mot. at 36.  Further, "[s]hrimp processors' operating

income was marginal and also declined" during the POI.  *Id*.  COGSI alleges the ITC appeared to

improperly rely on non-operating "other" income, such as BP Oil settlement payments and

CDSOA[9] distributions, despite the fact that COGSI admits the ITC "correctly classified [these

items] as 'other income' and properly distinguished [this other income] from the industry's

primary operations," in reaching a negative injury determination.  *Id*. at 37.  "Reliance on such

non-operating income is an unexplained departure from the Commission's longstanding prior

practice," according to COGSI.  *Id*. at 37.

COGSI also alleges that the ITC failed to address "improvements the domestic industry

saw after provisional relief was imposed," further indicating "the injury the domestic industry

was suffering was by reason of subject imports."  *Id*. at 40.  COGSI argues that the ITC never

---

[9] CDSOA stands for Continued Dumping and Subsidies Offset Act of 2000 and is commonly
called the Byrd Amendment.  It was repealed effective October 1, 2007.

"addressed [the] evidence that subsidized imports prevented the domestic industry from making needed capital investments." *Id*. at 40.  Finally, COGSI argues that the ITC ignored the "improvements in the domestic industry post-preliminary relief" which supports an affirmative injury determination. *Id*. at 41.

The ITC counters that its impact determination was supported by substantial evidence and in accordance with law.  *See* Def.'s Opp'n at 7-8, 33-41; *see also* Def.-Ints.' Opp'n at 33-38. The ITC "reiterated that the volume and market share of subject imports had been significant during the POI," but that "subject imports had not had significant price effects during the POI," noting that "in conducting its impact analysis, it was required to consider whether any injury to the domestic industry is by reason of the subject imports and ensure that it does not attribute injury from other factors to subject imports."  Def.'s Opp'n at 35.

The ITC reasoned that a "notable feature of the U.S. processors' financial results was that, for every year, their net income was positive and exceeded operating income on both an absolute basis and as a share of net sales . . . due to the amount 'other income' reported by the industry, which ranged a from a low of $21.4 million in 2010 to a high of $95.8 million in 2012." *Id*. (citing Views at 47-48).  The ITC explained that it "adopted Plaintiff's approach and treated the 'other income' resulting from CDSOA payments or BP Oil Spill compensation as non-recurring items" and did not include this as operating income in its impact analysis.[10]  *Id.* at 35-

---

[10] The record elucidates that the domestic industry received the following in BP Oil Spill compensation: $14.8 million in 2010, $22.6 million in 2011, $70.6 million in 2012, and $22.4 million in interim 2012, and zero in interim 2013; and the following in CDOSA distributions: $5.8 million in 2010, $17.7 million in 2011, $17.0 million in 2012, $716,000 in interim 2012, and $1.4 million in interim 2013.  *See* C.R. 1284 at VI-17, n.47.

36.  Upon examination of all the statutory factors, the ITC concluded that "subject imports had

not had a significant adverse impact on the domestic industry."  *Id*. at 36.

      **B.**     **Analysis**

      The ITC has a variety of statutory factors that it must consider in an impact analysis.  *See*

19 U.S.C. § 1677(7)(C)(iii)(I)-(IV).  The Court finds that the ITC considered the relevant

statutory factors and drew reasonable conclusions.  The ITC provided its findings: the landing

levels fluctuated but were comparable to those that occurred during the five-year period

examined in the 2011 antidumping reviews; shrimp harvest fluctuated but overall increased;

financial results fluctuated annually but remained positive throughout the POI; processors'

shipments and U.S. shipments fluctuated during the POI but increased from 2010 to 2012;

processors' ending inventory quantities fluctuated annually but increased overall from 2010 to

2012; number of production and related workers, hourly wages and labor productivity fluctuated

annually but increased overall from 2010 to 2012; and hours worked and total wages paid

increased each year of the period.  Def.'s Opp'n at 34 (citing Views at 43-46).[11]

      When examining the factors of net income and operating margins, the ITC noted that this

case presented an atypical circumstance for the ITC: "the net income of fishermen and

processors was positive throughout the POI and exceeded their operating income each year."  *Id*.

at 38.  The ITC admitted that the evidence shows that "the domestic industry's financial

performance continued at a marginal level and declined at the end of the POI," but determined

that "as a whole," the record "showed that the domestic industry was not materially injured by

---

[11] For a complete list of impact findings, see Views at 43-49.

reason of the subject imports." *Id*. at 36.  The ITC noted that "[d]ue to this unusual

circumstance," it decided "to perform a more detailed analysis of the industry's overall financial

results." *Id*.  Upon examination, the ITC found that the industry's net income levels had

benefitted from the industry's receipt of the BP Oil Spill compensation and from CDSOA

distributions. *Id*. (citing Views at 47-48).

      The ITC states that it reasonably took into account the impact of BP Oil Spill on the

industry but it "simply chose to place a different interpretation on the impact of the spill and its

related settlement than plaintiff would have preferred." *Id*.  It appears that the BP Oil Spill's

detrimental damage and subsequent settlement can be used as both a sword and a shield, and

perhaps the ITC could have gone equally either way.  The Court, however, reviews for

reasonableness of a determination and not whether it would have favored another outcome. *See*

*Universal Camera,* 240 U.S. at 488.  Accordingly, the Court finds that the ITC's chosen

interpretation and conclusion regarding impact on the affected domestic industry is supported by

record evidence and in accordance with law.

      For the foregoing reasons, the Court sustains the impact aspect of the *Final*

*Determination*.

### IV.    Period of Investigation

      The ITC must "evaluate all relevant economic factors . . . within the context of the

business cycle and conditions of competition that are distinctive to the affected industry."  19

U.S.C. § 1677(7)(C)(iii).  However, there is no statutory requirement for a POI so the ITC has

broad discretion when it comes to choosing the POI. *See Nucor v. United States*, 414 F.3d 1331,

1337 (Fed. Cir. 2005) ("the Commission has broad discretion with respect to the period of

investigation that it selects for purposes of making a material injury determination . . . because

the statute does not expressly command the Commission to examine a particular period of time")

(internal quotation and citation omitted).

### A.    Contentions

COGSI contends that the Commission erred by starting the POI in the year of the BP Oil

Spill and failed to factor this extraordinary event into its analysis.  *See* Pl.'s Mot. at 8-16, Pl.'s

Reply at 1-5.  Because the BP Oil Spill "was the worst in U.S. history" and "significantly

disrupted domestic shrimp production in 2010," COGSI claims that the ITC should have started

the POI in 2009 rather than 2010.  Pl.'s Mot. at 8.  Plaintiff further claims that by selecting a

three-year POI here, the Commission "departed without explanation from its use of a four-year

POI in prior decisions presenting similar factual scenarios."  *Id.* at 13 (citing P.R. 382 at 21,

n.95).  While admitting that "the Commission typically considers data for the three most recently

completed calendar years, plus applicable interim periods," COGSI argues that "the Commission

has [ ] used a four-year POI where other significant one-time events disrupted the domestic

industry's production or the market during the first year of what would otherwise be a three-year

POI."  *Id.* at 11, 12.

COGSI declares that the BP Oil Spill "was an extraordinary, short-lived, and once-in-a-

lifetime event that significantly impacted the domestic shrimp market in 2010."  *Id.* at 13.  Thus,

COGSI surmises that "[u]sing a four-year POI that includes the pre-spill year of 2009 was

necessary to allow the Commission to understand the conditions in the market and provide it

with a broader perspective of the industry."  *Id.*  COGSI submits that the Commission's

conclusion for selecting a three-year POI is unsupported by substantial evidence.  *Id.* at 14.

Plaintiff challenges the Commission's conclusion that "landings historically have fluctuated from year to year and in some prior years have been at levels somewhat comparable to 2010" and instead postulates that landings in 2010 were "the lowest level of landings in 35 years." *Id*. at 14.

The ITC counters that its selection of a three-year POI was reasonable. *See* Def.'s Opp'n at 11-16; *see also* Def.-Ints.' Opp'n at 2-6. The ITC explains that its normal practice is to choose a three year POI, which it did, because upon review of the number of landings over an eight year period (2005-2012), it noted that the number of landings in 2010 was comparable to the prior levels. *See* Def.'s Opp'n at 11. The Commission notes that it "addressed and reasonably rejected COGSI's request in the final investigation to add a fourth year (2009) to the POI, which COGSI asserted was necessary to reflect the supply disruption caused by the BP Oil Spill." *Id*. The ITC maintains that situations warranting a four-year POI are "relatively rare and reflect the unique circumstances in the markets involved." *Id*. at 12. The ITC declared that "the industry's landings in 2010, though low, were in fact somewhat comparable to the levels seen in other years, particularly in 2008" and therefore concluded that "expansion of [the] typical POI was not warranted here." *Id*. at 13 (internal quotation and citation omitted).

## B.    Analysis

The Commission's selection of a POI is not statutorily mandated, and it is well settled that the Commission has broad discretion when it comes to choosing the POI. *See Nucor*, 414 F.3d at 1337. The only statutory limitation regarding the POI is that the Commission "evaluate all relevant economic factors . . . within the context of the business cycle and conditions of competition that are distinctive to the affected industry." 19 U.S.C. § 1677(7)(C)(iii).

The Court finds that the ITC evaluated all relevant economic factors within the context of

the business cycle and conditions of competition that were distinctive to the affected industry, in

compliance with 19 U.S.C. § 1677(7)(C)(iii).  In the instant case, the record shows that the ITC

considered the BP Oil Spill in its selection of the three-year POI.  The Court further finds that the

ITC's choice of a three year POI is not unreasonable and consistent with its prior practice.  The

ITC normally choses a three year POI for investigations.  *See* Def.'s Opp'n at 11-12.  In fact, the

prior shrimp investigations had a three year POI.  *Id*. at 11.  In its reasoning of why it rejected

Petitioner's request to expand the POI to four years, the ITC explained that while looking "at the

2010 data in the light of the BP Oil Spill, we also note that landings historically have fluctuated

from year to year and in some prior years have been at levels somewhat comparable to 2010."

*Id*. at 11 (quoting Views at 28, n.95).

COGSI takes issue with the ITC's conclusion of "somewhat comparable" level of

landings in 2010 and offers the conclusion that 2010 reflected "the lowest level of landings in 35

years."  Pl.'s Mot. at 14.  Even though there may be a possibility of "drawing two inconsistent

conclusions from the evidence," this does not prevent the ITC's "finding from being supported

by substantial evidence."  *Am. Textile Mfrs. Inst.*, 452 U.S. at 523.  The Court cannot say that the

Commission's conclusion is not supported by the evidence.

The ITC points out Plaintiff's conceded that "the domestic shrimp production in any

given year is subject to one-off events."  *Id*. at 13 (internal quotation and citation omitted).  The

ITC stated that "such events are not entirely unique to this industry."  *Id*.  To take into account

the one-off of the BP Oil Spill of 2010, the ITC considered data from 2005 to 2012, which

highlighted that the "industry's landings fluctuated widely, ranging from a low of 199.0 million

pounds in 2010 to a high of 294.8 million pounds in 2006.  The second highest level at 261.8

million pounds occurred in 2009." *Id*. at 14.  Thus, the ITC concluded that "using 2009 as a

starting point would have resulted in an unrepresentative reference point because 2009 generally

reflected the industry's second highest landings and shipment levels during the 2005-2012

period." *Id*.  The ITC compiled a table from its Views to demonstrate this historical data.  *See*

*id*., Table 1.

  As previously noted, the ITC not only considered typical factors, such as supply, demand,

and substitutability, found in every investigation or review but also considered conditions

distinctive to this investigation, such as the BP Oil Spill and EMS, in its investigation.  *See*

Views at 27-37.  In the context of the business cycle and conditions of competition, the ITC

determined that the number of landings did not prove that 2010 was a year of "extraordinary

supply disruption" as COGSI describes.  Pl.'s Reply at 2.  The ITC exercised its broad discretion

in its finding that the BP Oil Spill was not "unique" enough to select a four-year POI.  Def.'s

Opp'n at 12.  Under the substantial evidence standard, the Court may not "substitute its own

judgment for that of the agency."  *Usinor,* 342 F. Supp. 2d at 1272.  Accordingly, the Court will

not displace the ITC's conclusion that the one-off event of the BP Oil Spill did not warrant the

expansion of typical three-year POI.  The Court finds that the ITC fulfilled its statutory

obligation under 19 U.S.C. §1677(7)(C)(iii) to consider the conditions of competition that are

distinctive to the affected industry.

  For the foregoing reasons, the Court sustains the POI selection of the *Final*

*Determination*.

**V.      Threat**

When determining whether an industry in the United States is threatened with material

injury by reason of imports (or sales for importation) of the subject merchandise, the ITC must

consider, among other relevant economic factors—

> (I) if a countervailable subsidy is involved, such information as may be
> presented to it by the administering authority as to the nature of the
> subsidy (particularly as to whether the countervailable subsidy is a subsidy
> described in Article 3 or 6.1 of the Subsidies Agreement), and whether
> imports of the subject merchandise are likely to increase,
> (II) any existing unused production capacity or imminent, substantial
> increase in production capacity in the exporting country indicating the
> likelihood of substantially increased imports of the subject merchandise
> into the United States, taking into account the availability of other export
> markets to absorb any additional exports,
> (III) a significant rate of increase of the volume or market penetration of
> imports of the subject merchandise indicating the likelihood of
> substantially increased imports,
> (IV) whether imports of the subject merchandise are entering at prices that
> are likely to have a significant depressing or suppressing effect on
> domestic prices, and are likely to increase demand for further imports,
> (V) inventories of the subject merchandise,
> (VI) the potential for product-shifting if production facilities in the foreign
> country, which can be used to produce the subject merchandise, are
> currently being used to produce other products,
> (VII) in any investigation under this subtitle which involves imports of
> both a raw agricultural product (within the meaning of paragraph
> (4)(E)(iv)) and any product processed from such raw agricultural product,
> the likelihood that there will be increased imports, by reason of product
> shifting, if there is an affirmative determination by the Commission under
> section 1671d (b)(1) or 1673d (b)(1) of this title with respect to either the
> raw agricultural product or the processed agricultural product (but not
> both),
> (VIII) the actual and potential negative effects on the existing
> development and production efforts of the domestic industry, including
> efforts to develop a derivative or more advanced version of the domestic
> like product, and

      (IX) any other demonstrable adverse trends that indicate the probability
that there is likely to be material injury by reason of imports (or sale for
importation) of the subject merchandise (whether or not it is actually being
imported at the time).

19 U.S.C. § 1677(7)(F).

### A.   Contentions

COGSI contends that the Commission's threat determination is unsupported by

substantial evidence and contrary to law.  *See* Pl.'s Mot. at 41-45, Pl.'s Reply at 21-24.  COGSI

alleges that the ITC failed to consider the nature of subsidies provided and the evidence of

vulnerability in its threat determination.  S*ee* Pl.'s Mot. at 41, 45. COGSI asserts that "the

Commission provided no discernible reasoning indicating it considered the fact that many of the

subsidies Commerce found were export subsidies, or the extent to which such subsidies are more

likely to affect future import volumes and to threaten injury."  *Id*. at 42 (citing P.R. 382 at 37-

40).  However, COGSI concedes that "the Commission need not discuss each of the threat

factors it is required to consider" so long as its reasoning is clear enough to be easily discerned.

*Id*. at 42.  COGSI also argues that "the Commission's negative threat determination was based

on its flawed volume, price effects, and present material injury conclusions," and thus "cannot be

sustained on the basis of these findings."  *Id*.

      In the alternative, COGSI asserts that should the Court sustain the volume, price effects

and material injury conclusions, the threat conclusion is still unsupported because those factors

alone cannot sustain the ITC's negative threat determination.  *See id*. at 43.  COGSI alleges the

ITC ignored evidence of excess capacity in favor of sole reliance on "subject producers own low

projections."  *Id*. (citing P.R. 382 at 38 & n.211).  COGSI argues that the "evidence seriously

undermines the Commission's conclusion that subject producers' significant excess capacity

does not indicate a likelihood of significantly increased imports, and its sole reliance on subject

producer's capacity projections in light of this evidence is unreasonable." *Id*. at 43-44.  Plaintiff

also argues that the Commission "failed to address evidence of declining demand and new

import barriers in the [EU], Japan and other export markets." *Id*.  Finally, COGSI alleges that

"the Commission did not address the evidence of capital expenditures delayed and foregone by

the domestic industry due to import competition." *Id*.

    The ITC counters that its threat determination was supported by substantial evidence and

in accordance with law.  *See* Def.'s Opp'n at 41-46; *see also* Def.-Ints.' Opp'n at 39-44.  In its

analysis, the ITC found that "there were many positive trends in [the domestic industry's]

performance . . . [and t]here was no indication these factors would change in the imminent

future." *Id*. at 41 (citing Views at 53-54).  The ITC stated that "[s]ubject imports had not

adversely affected the condition of the domestic industry, as the industry was able to increase its

market share and shipments in a declining U.S. market and to increase prices overall for its

products." *Id*. at 41.  The ITC found that because the EMS crisis "was not expected to be

resolved soon," the "resulting limitation on supplies due to EMS" and in "improvements in the

industry's shipments, market share and prices would likely continue in the imminent future." *Id*.

at 42 (citing Views at 53).

    Another factor in its negative threat determination is that subject producers "only

reported a small increase in their projected capacity through 2014." *Id*. at 42.  As a result, the

ITC concluded that subject producers' "excess capacity did not threaten significant increased

volumes for the subject imports." *Id*.  Further, the ITC found that "it was unlikely" that subject

producers' "steady focus on the U.S. market" would be increased in the imminent future because "increases in subject imports had been at the expense of nonsubject imports and because EMS issues would likely continue to constrain supply from several subject countries." *Id*.  The ITC notes that other factors it considered in its threat analysis, such as import prices and inventories, did not support an affirmative threat finding.  *See id*. at 43.

The ITC also notes that the existence of "outstanding U.S. antidumping duty orders on shrimp" which were "likely to have a disciplining effect on the volume and prices of imports from [China, India and Vietnam] at least for the imminent future." *Id*.  According to the ITC, subject imports had "no significant actual or potential negative effects on the existing development and production efforts" of the domestic industry.  *Id*.  Therefore, the ITC concludes that it "reasonably exercised its discretion to weigh the evidence relating to the statutory threat factors in its analysis." *Id*.

### B.    Analysis

The threat statute requires that the ITC consider certain factors but not does specify the weight that each factor should receive.  The Court reviews to ensure that the requisite statutory factors were considered and that the analysis was reasonable.  The relevant factors required by the statute include subject import volume, subject countries' excess capacity, rate of increase of subject imports, subject import prices, subject merchandise inventories, potential for product shifting, actual and potential negative effects on the existing development and production efforts of the domestic industry, and other adverse trends.  Upon review of the record, the Court finds that the ITC fulfilled its statutory obligation and considered the requisite statutory factors.  *See*

Views at 52-58.  Further, the Court finds that the Commission's analysis of these statutory

factors was reasonable.

For the foregoing reasons, the Court sustains the negative threat finding of the *Final*

*Determination*.


CONCLUSION

There is no question that the domestic industry suffered a tragedy of enormous

proportions during this POI.  However, a finding of injury requires that the domestic industry

suffer "material injury by reason of [subject] imports" under 19 U.S.C. § 1677(7)(B), and in the

case at bar, the ITC did not make that requisite finding of causation.  *See Hynix Semiconductor*,

431 F. Supp. 2d at 1306.  Upon review of the record, the Court finds reasonable the ITC's

conclusion that COGSI's suffering during this POI was mainly caused by the BP Oil Spill and

not by reason of subject imports.  Subject imports supplied the void in the market demand caused

by a third party, and the foreign producers were merely taking advantage of a business

opportunity.  This does not constitute unfair trade.  The antidumping and countervailing duty

framework is a remedy for harm caused by unfair trade, not for lost business caused by a

disastrous accident.  The remedy sought by COGSI in the case at bar has statutory limitations

regarding causation, and the Court cannot say that the Commission was unreasonable in its

rendering of those limitations.

Court No. 13-00386                                                                                         Page 31

 For the foregoing reasons, the Court denies Plaintiff's motion for judgment on the agency

record and sustains the ITC's *Final Determination*.  Judgment will follow.


                 _____/s/ Gregory W. Carman_____
                 Gregory W. Carman. Senior Judge

Dated: April 3, 2015
    New York, New York